### Augustus D. Burdeno v. Marinus Amperse.

*Common Law disability of married women.*—The basis of the Common Law disability of married women rested on the peculiar disqualifications and burdens of the wife, and not upon anything growing out of the marital relation.

The removal of those disqualifications removes all the reasons which ever required the intervention of equitable trusts. Under statutes giving power to a married woman to enjoy, contract, sell, transfer, convey, devise, or bequeath her property in the same manner and with like effect, as if she were unmarried, it was *held*, that a husband can convey real estate to his wife by deed, directly, without the intervention of a trustee.

*Heard October 13th,* 1865. *Decided January 6th.*

Error to Wayne Circuit.

This was an action of *trespass quare clausum fregit*, commenced before a Justice of the Peace. The defendant gave notice under the statute of title to real estate, and the cause was certified to the Circuit Court. On the trial, the defendants offered in evidence a deed of the premises from the plaintiff to Victoria Burdeno, his wife, to the admission of which the plaintiff objected on account of the relation between the parties. The court sustained the objection, and the defendant excepted.

*Ward & Palmer* for plaintiff in error.

*Larned & Hebden,* and *Wm. Gray* for defendant in error.

CAMPBELL J.

Burdeno sued plaintiffs in error in tresspass for alleged

wrongful acts upon his freehold, being land covered by water. The suit was for treble damages to Burdeno, as proprietor of the land, the statutory action not lying for mere possession.— *Achey v. Hull,* 7 *Mich.* 423. Defendants offered to show that Burdeno had, in September 1861, conveyed the property by deed to his wife, Victoria Burdeno. This deed was objected to as invalid, because of the relation of the parties; and the Court below sustained the objection, and rejected the evidence.

The question is presented, therefore, whether, as our laws now stand, a deed can be made by a husband to his wife. To determine this question, we must see how their relations were governed, in this respect, before our present system was introduced.

The effect of marriage was to produce what is called in the law-books *unity of person;* the husband and wife being but one person in the law:— *Co. Litt.* 112 *a*; 1 *Bl. Com.* 442. The wife, by her coverture, ceased to have control of her actions or her property, which became subject to the control of her husband, who alone was entitled, during the marriage, to enjoy the possession of her lands, and who became owner of her goods and might sue for her demands. The wife could neither possess nor manage property in her own right, could make no contract of a personal nature which would bind her, and could bring no suit in her own name. In short, she lost entirely all the legal incidents attaching to a person acting in her own right. The husband alone remained *sui juris,* as fully as before marriage.

It followed from this legal merger by coverture into a single personality, that the husband could make no grant to the wife, and the wife could make none to the husband. And furthermore, a grant to her by her husband, of a freehold, would be, in effect, a grant to take effect *in futuro* (the husband retaining possession for life), and such a grant was unlawful because a freehold could only pass by "*livery of seisin,*" which must operate either immediately or not at all. It

would, therefore," continues Blackstone, "be contradictory, if an estate, which is not to commence till hereafter, could be granted by a conveyance which imports an immediate posses- sion."—2 *Bl. Com.* 165.   But a husband might make a devise to his wife, "for that such devise taketh no effect but after the death of the devisor:"—*Littleton,* § 168;  *Co. Litt.* 112 *a, b.* The same incidents of coverture which made the husband sole possessor of his wife's lands, led to the rule which made estates in their joint names differ from joint tenancies proper, and regarded the title, not as held by moieties, but as an entirety: — 2 *Bl. Com.* 182;  *Co. Litt.* 187 *a.*

Whether the common law rule preventing husband and wife from making grants to each other is a rule springing from, and inseparably attached to, the relation of marriage, or whether it is an incident to the wife's disability to control property in her own right, must guide us somewhat in deter- mining the effect of our enabling statutes.   There can be no doubt that there are incidents of marriage independent of all considerations of property.   The common law writers never attempted to classify them, and we must get such light as we can from examples and analogies.   It is safe, however, to assume that no act can be absolutely inconsistent with the marriage relation, if it has received the sanction of either law or equity.   We must, therefore, see whether the disabilities which applied at common law, in cases like the one before us, have been regarded as universal and personal disqualifications. Upon this we have an abundance of authority.

There were *local customs* whereby a wife might take by *immediate* conveyance from her husband; as, for example, at York: — *Fitzh. Ab. Prescription* 61;  *Brown's Ab. Custom,* 56 (cited *Tomlyn Law Dic. Baron and Feme*).   The Queen Consort may sue and be sued, alone, may take grants from her husband, as well as from strangers, may take as well as receive grants, and may covenant:— *Com. Dig. Roy, F.* 1.   A husband could convey to the use of his wife under the Statute of Uses, whereby the use vested in her directly as a legal

estate, without the action of the feoffee:— *Com. Dig. Baron and Feme, D. 1*, citing *Co. Litt.* 112 *a.* And he might under the same statute covenant with a third person to stand seised to the use of his wife: —*Id.*

It appears, therefore, that the law did not prohibit a husband from accomplishing for his wife the precise thing which he would have accomplished by a direct conveyance; and it would seem from this that the rule was one of technicality, and not of substance. But there are further illustrations which will throw light upon the subject. When husband and wife were dealing, not in their own right but in a representative character, or what is termed technically, *in auter droit*, either might sell and convey to the other, as to a stranger:— *Co. Litt.* 112 *a*, 187 *b*; *Com. Dig. Baron and Feme, D.* 1. It needs no remark to suggest that if the common law was designed to produce unity of will, and to prevent action except by one not under influence or compulsion, no such practice as this could be permitted; for a husband's influence over his wife is personal, and will operate just as strongly, in fact, in one class of dealings as in another. The rule can only be made sensible by holding that, as to matters which a wife could be allowed to hold and manage separately from any interest of her husband, these disabilities of coverture did not exist, or, in other words, that they were not regarded as personal only, but as relative to property. Thus far we have considered only such rights as are *legal*, as distinguished from equitable, and are enforced in all courts alike. But there has grown up by the side of the common law, a system of equitable rights and powers, which places married women, in regard to property, on the same footing in most respects with single women. When property is set apart for the *separate use* of a married woman, she is, in regard to it, emancipated from the disabilities of coverture, so far as the terms of the trust warrant. This emancipation from her legal disabilities does not depend upon the husband's consent, nor upon any antenuptial agreement. It can be accomplished by any

one, relative or stranger, who sees fit to provide a fund for her benefit.

She may sue and be sued concerning it; she may contract concerning it, and her contracts will bind it and be enforced; she may give it, or sell it. Her title is technically an equitable one, and not a legal one; but the trustees are bound to follow her directions, and the distinction is purely formal. The income and proceeds are under her separate control and enjoyment, and her husband has nothing to do with them. Her doings, though not under the dominion or enforcement of courts of law, are recognized by such courts as valid, just as they are recognized and enforced in equity. If the legal disabilities were essential elements of coverture, then equity, which recognizes and follows all the substantial principles of law, could not dispense with them. It would be a gross absurdity for any court to destroy the substantial rights of the husband, or remove his lawful control. And it would be still more absurd to permit this interference at the hands of any meddling stranger at his option. But the doctrine has been long settled that as to her separate estate a wife is on substantially the same footing with a *feme sole.*—See *Pybus v. Smith,* 1 *Ves. Jr.* 189; *Sturgis v. Corp,* 13 *Ves.* 190; *Essex v. Atkins,* 14 *Id.* 542; *Wagstaff v. Smith,* 9 *Id.* 520; *Grigby v. Cox,* 1 *Ves. Sen.* 518; *Freeman v. Moore,* 1 *Bro. P. C.* 237; 1 *Hov. Sup.* 49–50; 2 *Spence's Eq. Jur.* 513; *Jacques v. Methodist Episcopal Church,* 17 *Johns.* 548; 2 *Story Eq. Jur.* § 1395–6.

Not only may she make disposition of it to others, but she may do so also in favor of her husband. The disability of the common law which arose from the very fact that she was *sub potestate viri* (and which undoubtedly is usually the case as a matter of fact to a great degree), was not considered as existing in equity, which sustained such dealings if fair and not unduly biased:—2 *Story Eq. Jur.* § 1395; *Essex v. Atkins,* 14 *Ves.* 542; *Jaques v. Methodist Episcopal Church,* 17 *Johns.* 548; 1 *Hov. Sup.* 49, and cases above. She can even

bargain with her husband concerning her separate estate, and the agreement will be enforced: — *Lady Arundel v. Phipps*, 10 *Ves.* 140; *Livingston v. Livingston*, 2 *Johns. Ch.* 537; *Wallingford v. Allen*, 10 *Pet.* 583; *Bullard v. Briggs*, 7 *Pick.* 533.

Instead of looking with disfavor upon the settlement of separate property, equity has favored it. A separate estate will not fail for the lack of trustees, and if the legal title comes into the husband's hands, he himself will be held to be a trustee to his wife's separate use, and therefore subject to her orders; and he may be made a trustee expressly: — 2 *Kent's Com.* 162; 2 *Spence's Eq. Jur.* 507; *Wallingford v. Allen*, 10 *Pet.* 583. Not only may a husband settle property to his wife's use through trustees, but he may make himself a trustee by agreement, or even by gift, where he has by some distinct act set apart the property. In *Lucas v. Lucas*, 1 *Atk.* 270, where a husband caused stock to be transferred to the name of his wife, although at law it would of course continue to be his own property, it was held to have been made his wife's separate fund. So in *Shepard v. Shepard*, 7 *Johns. Ch.* 57, and in *Wallingford v. Allen*, above cited, it was held that a conveyance directly from husband to wife should under the circumstances be enforced as valid in equity.

When equity recognizes a power in the wife, who is the disabled party, not only to deal with others, but even to contract with and make provision for her husband out of her separate funds, it can hardly be claimed that the husband, who was always *sui juris*, is restrained by any but technical rules from transferring to her directly. We have seen that equity will enforce even such conveyances. But there never was a time when he could not by his deed put property where she could control it. If it were not that by standing in her name he became legally the owner of the usufruct, there could be no valid reason why any indirection ever need be resorted to. It is not against the policy of the law that

the wife should have the real benefit of his gift; and equity, looking through the form at the substance, calls it, as it is in fact, a gift from husband to wife. The doctrine laid down by *Coke*, in connection with the Statute of Uses, is of itself sufficient to show that the disability as to conveyances springs entirely from the wife's incapacity to act for herself; and it is stated in 2 *Kent's Com.* 163, *n. b*, that by the present English statutes a husband is now authorized to make a direct conveyance to his wife.

Our statutes have given power to a married woman to enjoy, contract, sell, transfer, mortgage, convey, devise, or bequeath her property in the same manner, and with the like effect, as if she were unmarried:—2 *C. L.* § 3292. Where it stands in trust for her, the trustees are authorized to transfer it to her:—2 *C. L.* § 3293. The statute evidently designs to do away with indirect dealings, and make her rights legal instead of equitable. Passive trusts have been entirely abolished, and where a deed creates them the title passes at once to the beneficiary:—2 *C. L.* § 2633-4-5. To require a husband (who is not supposed to be under her control or fear) to go through the farce of conveying to some one else, who is at once to pass the property over to his wife, is to keep up a fiction which has not even a legal basis to support it, since the husband has ceased to have possessory claims over her property. He is now in law a stranger to her estate during coverture, instead of its possessor and manager; and his consent is not necessary to her disposal of it:—*Farr v. Sherman*, 11 *Mich.* 33; *Watson v. Thurber*, 11 *Id.* 457. Whatever protection she may require when dealing with him, he certainly never was supposed to need any against her.

Believing, as we do, that the basis of the common law disability was in the peculiar disqualifications and burdens of the wife, and that the removal of these removes all the reasons which ever required the intervention of equitable trusts, we think there is now no objection to a deed from husband to wife, which should render it invalid.

The Court erred in excluding the deed. The other points become immaterial.

Judgment must be reversed, with costs, and a new trial granted.

CHRISTIANCY and COOLEY JJ. concurred.